**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| ROBIN BREDA, *on behalf of herself and all others similarly situated*,<br><br>        Plaintiff,<br><br>v.<br><br>CELLCO PARTNERSHIP d/b/a VERIZON WIRELESS,<br><br>        Defendant. | Civil Action No.  **1:16-cv-11512-DJC** |

## DEFENDANT'S CELLCO PARTNERSHIP d/b/a VERIZON WIRELESS' OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

### PRELIMINARY STATEMENT

This case is not about random robocalls or a referendum on the ills of such calls any more than it is about harassing third parties as Plaintiff Robin Breda attempts to portray in her Motion for Class Certification.  Rather, it concerns defendant Cellco Partnership d/b/a Verizon Wireless ("**Verizon**") attempts to reach *its customers* about past due balances and possible service interruptions by calling "can-be-reached" numbers ("**CBR Numbers**") *that were provided to Verizon by its customers with express consent to call*.  Plaintiff founds her Motion on the faulty premise that Verizon's calls to those numbers were answered by *non-customers* who *impliedly* revoked consent to call by pressing 2, then 3 in response to Verizon's Interactive Voice Response ("**IVR**") script.  Plaintiff's factual premise is incorrect—Verizon did not admit that non-customers answered all of the calls at issue in this case and whether a *customer* or *non-customer* answered the calls cannot be determined without further individualized inquiries into each call.  Even if *non-customers* answered all the calls, however, ascertaining whether *any call recipient* revoked consent is not subject to common proof, but requires further individualized

inquiries at trial as well.

Furthermore, Plaintiff's "key press" *implied* revocation of consent theory cannot serve as a basis for class certification under the Telephone Consumer Protection Act ("**TCPA**") as a matter of law and fact in this case.  Plaintiff may not rely on alleged "wrong number" key presses in the IVR script as proxies for revocation of consent.  At best, all that pressing 2, then 3 indicates is that an *unknown* call recipient pressed certain buttons that might indicate Verizon had called the "wrong number."  The record reveals, however, that those designations are not reliable as proof of alleged "wrong numbers" let alone as common proof of revocations of consent.  Plaintiff's own expert proves this point in his proffered expert reports.

Beyond misunderstanding the factual record, Plaintiff also misunderstands the law. Contrary to Plaintiff's unsupported assertion, "administrative feasibility" is an element of "ascertainability" in the First Circuit.  Plaintiff, however, failed to provide this Court with *any method*—administratively feasible or otherwise—to determine without individualized inquiry *who* actually answered the calls at issue in this case.  Rather, Plaintiff merely gave this Court a list of telephone numbers to certify—nothing more.  This is insufficient to ascertain a class.

Fundamentally, Plaintiff has not proffered any factual or legal issue that can be resolved through common proof.  Rather, Plaintiff—and her own proffered expert witness—have shown that certifying her proposed "telephone number" class will require the parties and this Court to conduct over 60,000 mini-trials not only to determine if Verizon even violated the TCPA, but also to determine the threshold issue of who the class members actually are and where to send notice to advise them of their rights under Rule 23 and the TCPA.  Identifying class members is essential as Verizon has a due process right to challenge class membership just as much as it has a right to defend each claim.  Plaintiff may not deny Verizon those rights through the improper

use of Rule 23.  Consequently, this Court must deny Plaintiff's Motion.

**COUNTER STATEMENT OF RELEVANT FACTS**

A.    <u>**Verizon's Customer Agreements and "Can Be Reached" Numbers.**</u>

When a Verizon customer opens an account for post-paid, cellular telephone service, the

customer enters into the Verizon Wireless Customer Agreement ("**Customer Agreement**").[1]  In

particular, each customer expressly agrees to the following:

> You consent to allow Verizon Wireless . . . to contact you about your account
> status, including past due or current charges, using prerecorded calls . . .
> delivered by an automatic telephone dialing system to any wireless phone number
> . . . you provide.[2]

Each Customer Agreement contains the same or similar language as set forth above.[3]  At account

opening, each customer is required to provide a "can-be-reached" number ("**CBR Number**") so

that Verizon may contact the customer regarding their service if Verizon is not able to do so by

calling a Verizon mobile telephone number ("**MTN**") assigned to the account.[4]  To open an

account, at least one CBR Number must be listed, and those numbers are provided *by customers*

---

[1] *See* Fifth Declaration of Cheryl Boulanger, dated May 26, 2021 ("**Boulanger 5th Decl.**"), ¶ 6 (attached as Exhibit 1 hereto); Third Declaration of Cheryl Boulanger, dated June 9, 2017, ¶ 5 (Dkt. 73); Fourth Declaration of Cheryl Boulanger, dated March 27, 2020 ("**Boulanger 4th Decl.**"), ¶ 3 (Dkt. 149); Rule 30(b)(6) Deposition of Meryl Friedman, dated October 23, 2020 ("**Friedman Dep.**"), 199:1-200:25 (attached as Exhibit 2 hereto).

[2] *See* Boulanger 5th Decl., ¶ 6 & Ex. 1 attached thereto (containing genuine copies of Customer Agreements in effect for 2014-2020); Friedman Dep., 199:1-200:25.

[3] *See* Boulanger 5th Decl., ¶ 6 & Ex. 1 attached thereto; Friedman Dep., 201:8-21.  As such, contrary to Plaintiff's assertion (Pl. Brief, p. 1), Verizon has established it had prior express consent to call the CBR Numbers.  *See* <u>Gorss Motels, Inc. v. AT&T Mobility LLC</u>, No. 3:17cv403 (JBA), 2019 WL 625699, *6 (D. Conn. Feb. 14, 2019) (consent in customer agreements sufficient to evidence consent in opposing motion for class certification).

[4] *See* Boulanger 5th Decl., ¶ 7; Boulanger 4th Decl., ¶ 4; Friedman Dep., 136:8-19.

*only.*[5]   CBR Numbers typically are a *customer's* work telephone number, a *customer's* residential telephone number, or a family member's or friend's telephone number.[6]

As each account must have a CBR Number listed, if a customer refuses to provide a CBR Number, a Verizon customer service representative may populate the required fields with invalid numbers—such as 999-999-9999.[7]   There is no record evidence demonstrating that Verizon representatives use anything other than 999-999-9999 in such circumstances.[8]   Indeed, contrary to Plaintiff's assertion, those invalid numbers are not even dialed by Verizon[9] and do not "often end up being numbers of third parties who did not consent and are harassed" by Verizon.[10] Likewise, the record does not reveal that all or any of the CBR Numbers at issue here "belong" to *non-customers*,[11] or that Verizon chose to call third parties "to shame someone into a paying a

---

[5] *See* Boulanger 5th Decl., ¶¶ 7, 8; Declaration of Cheryl Boulanger, dated April 4, 2017 ("**Boulanger 1st Decl.**"), ¶ 10 (Dkt. 45); Boulanger 4th Decl., ¶ 4 Friedman Dep., 132:17-20; 136:8-19.

[6] *See* Boulanger 5th Decl., ¶ 8; Rebuttal Expert Report of Debra J, Aron, Ph.D., dated May 26, 2021 ("**Dr. Aron Report**") (attached as Exhibit 3 hereto), ¶ 78.

[7] *See* Friedman Dep., 144:16-145:5.   Ms. Friedman referred to these numbers as "bogus" numbers.  *See id.*

[8] The number provided by Megan Kelton—Plaintiff's number—was not a "bogus" number provided by a Verizon representative.  *See* Pl. Brief, p. 6, n. 4.  Rather, it was an actual CBR phone number fraudulently provided by a Verizon's customer.  *See* Boulanger 5th Decl., ¶ 18 ("The Breda Number was listed on only one account as a CBR Number, which was Megan Kelton's account because the number had been provided to Verizon by Ms. Kelton as a CBR Number—apparently fraudulently.").

[9] *See* Friedman Dep., 144:25-145:5 ("It's a 999-999-9999.  So, yes, it's not a number that would be dialed.").

[10] *See* Pl. Brief, p. 6, n. 4.  Tellingly, Plaintiff does not support her assertion with any citation to the record.  That is because there is none.  Plaintiff's assertion is baseless.

[11] *See* Pl. Brief, p. 6; *see also* **ARGUMENT**, **I: THE PROPOSED CLASS IS NOT ASCERTAINABLE**, *infra.*, at pp. 16-24.

debt or having the friend act as a debt collector" as Plaintiff contends.[12]  Those incorrect assertions reveal Plaintiff's fundamental misunderstanding or misconstruction of the facts.[13] Based on the record here, without further fact-intensive inquiries, neither Plaintiff nor Verizon knows *who* the numbers provided as CBR Numbers "belonged" to at the time of the calls—they may have been a customer's or a non-customer's number.[14]

---

[12] *See* Pl. Brief, p. 7, n. 6.  Tellingly, Plaintiff does not support her assertion here with any citation to the record.  That is because Plaintiff's assertion is baseless.

[13] *See* Pl. Brief, p. 6 (citing Friedman Dep., 135:14-24).  Plaintiff misconstrues Ms. Friedman's testimony.  Ms. Friedman did not testify that the CBR Numbers could not belong to the account holder or another user on the account; but rather, that the numbers could not be a phone number associated with the account, whether the account holder's or any "user on the account's Verizon number."  *See* Friedman Dep., 110:12-25, 135:14-24.  Accordingly, Ms. Friedman did not testify a customer could not provide a CBR Number that was his or her *own* number.  *See id.*  Plaintiff similarly misconstrues Verizon's expert's (Dr. Debra Aron) report.  *Compare* Pl. Brief, pp. 7-8 (wherein Plaintiff asserts Verizon admitted that the only instance in which a CBR Number might actually belong to customer would be if the customer had a second cellular telephone—citing Dr. Aron's Report, ¶ 173) *with* Dr. Aron Report, ¶ 78 (explaining that, "[i]n some instances, the customer may have another wireless phone with another wireless provider (when, for example, the Verizon customer's employer provides the Verizon customer with a non-Verizon cellphone), and may provide that number as a CBR Number.") *and* ¶ 173 (where Dr. Aron merely stated that a CBR Number "may not" be a customer's number and provided an example of a customer giving a friend's or family member's number if the customer did not have another cellular telephone); Boulanger 5th Decl., ¶ 8 (where Ms. Boulanger states that CBR Numbers may be a customer's work or residential number—in addition to non-customer numbers).  Plaintiff also misconstrues the IVR script.  *See* Pl. Brief, pp. 6, 7.  The IVR script clearly asks the call recipient if he or she *is the customer* and, if so, instructs them to press 1.  That the script also has options for *non-customers* demonstrates Verizon is not aware if the CBR Number it is calling belongs to a customer or non-customer.  Plaintiff concedes this point by asserting that CBR Numbers "typically" belong to employers, friends, and family members.  *See* Pl. Brief, p. 6.  Therefore, Plaintiff incorrectly asserts that all of the calls in this case are calls that could have been placed to a Verizon customer's MTN, but were instead placed to a friend, family member, or employer.

[14] Furthermore, that Verizon has not identified any particular CBR Number as a customer's "second cellphone" is of no significance and misses the point.  *See* Pl. Brief, p. 8.  Plaintiff has the burden to ascertain a class—not Verizon.  *See* **ARGUMENT, I: THE PROPOSED CLASS IS NOT ASCERTAINABLE**, *infra.*, at pp. 16-24.  Identifying what CBR Numbers belonged to Verizon's customers is one of the individualized issue that prevents a finding of ascertainability and predominance, among other things, in this case.  *See id; see also* **ARGUMENT, II: PLAINTIFF'S PROPOSED CLASS DOES NOT SATISFY FED. R. CIV. P. 23(B)(3) PREDOMINANCE OR SUPERIORITY REQUIREMENTS**, *infra.*, at pp. 24-35.

Finally, Plaintiff misconstrues Verizon's answer to Plaintiff's Interrogatory No. 13.[15] Verizon did not simply assert (as Plaintiff claims) that it "does not need to obtain consent for its calls"; rather, Verizon stated: "[a]s a cellular telephone company, VERIZON is permitted to dial its own customers' cellular telephone using an ATDS or prerecorded voice message and does not need to obtain consent for its calls. *See* 7 FCC Rcd. 8752, 8775 (1992)."[16] Verizon's answer references the FCC's ruling that cellular carriers need not obtain consent to call from their own customers.[17] Verizon did not state it did not need consent to call the CBR Numbers. Regardless, contrary to Plaintiff's claims, Verizon did have consent to call the CBR Numbers as they were provided to Verizon by Verizon's customers pursuant to the terms of the Customer Agreement.[18]

## B.   Verizon's Calls to Customers and Calling Records.

When Verizon makes a call to a customer whose account is in arrears and at risk of suspension or termination, Verizon calls the customer's assigned MTN or a CBR Number associated with the customer's account.[19] Verizon does not use any type of "skip tracing" (*i.e.*,

---

[15] Pl. Brief, p. 7.

[16] *Compare* Pl. Brief, p. 7 *with* Pl. Ex. 6, at pp. 15-16 (Verizon's objections and answer to Plaintiff's Interrogatory No. 13). Plaintiff's citation to Ms. Friedman's testimony to support the statement that Verizon does not ever attempt to investigate who actually owns a CBR Number is misleading at best. *See* Pl. Brief, p. 7. Ms. Friedman's answer, which was provided subject to Verizon's counsel's objection, does not support Plaintiff's assertion. *See* Friedman Dep., 136:8-137:20.

[17] *See* Pl. Ex. 6, at p. 16; Report and Order, FCC 20-186, at ¶ 50 (Dec. 30, 2020), *available at* https://docs.fcc.gov/public/attachments/FCC-20-186A1.pdf ("[W]e note that in 1992, the Commission concluded that cellular carriers need not obtain "additional consent" from their subscribers prior to initiating autodialed, artificial voice, or prerecorded voice calls for which the cellular subscriber is not charged because such calls are not prohibited by section 227(b)(1)(A)(iii)."

[18] *See supra.*, at pp. 3-4.

[19] *See* Boulanger 5th Decl., ¶ 9; Boulanger 4th Decl., ¶ 5; Boulanger 1st Decl., ¶¶ 10-14; Declaration of Karl King, dated May 26, 2021, ¶ 3 (attached as Exhibit 4 hereto); Dr. Aron Report, ¶ 52 & n. 71.

using a service to find customer numbers) to call its customers for those purposes.[20]   Verizon

uses an Interactive Voice Response ("**IVR**") system when making these calls.   Contrary to

Plaintiff's claim that Verizon intends *only* to reach non-customers when making these calls,[21] the

script contemplates that *the customer or* a customer's family member or friend may answer the

call because the customer may not be available and Verizon may be calling a CBR Number.[22]

The IVR script provides the following messages and options:



Specifically, in the opening message, the IVR script begins by asking whomever answers the call

if the answering party *is the customer* Verizon is attempting to reach.[24]   If the customer answers,

the customer is instructed to press 1 to be connected to an Agent to discuss the account.[25]   If the

---

[20] *See* Boulanger 5th Decl., ¶ 7; Boulanger 4th Decl., ¶ 5.

[21] *See* Pl. Brief, pp. 6-7.

[22] *See* Boulanger 5th Decl., ¶¶ 4, 9; Boulanger 1st Decl., ¶ 10; Friedman Dep. 40:10-41:14.

[23] *See* Exhibit 5 attached hereto (a genuine copy of the relevant IVR script, which is Bates
stamped VZ0046); Friedman Dep. 40:10-41:14.

[24] *See* Exhibit 5; Boulanger 5th Decl., ¶ 9; Boulanger 1st Decl., ¶ 10.

[25] *See* Exhibit 5; Boulanger 5th Decl., ¶ 9; Boulanger 1st Decl., ¶ 10.

person answering is not the customer (or if the person is the customer and chooses not to acknowledge it), the script instructs *the call recipient* to press 2 and then (i) press 1 if the person needs time to bring the customer to the telephone, (ii) press 2 if the customer is not available, or (iii) press 3 if Verizon is calling the wrong number.[26]  If the call recipient presses 3, they are informed the call will be transferred to an Agent.[27]

Verizon requires any call recipient who presses 2, then 3 in the IVR script to speak with an Agent because Verizon is calling either a Verizon MTN or a CBR Number, and persons answering calls about overdue bills often times do not tell the truth to avoid Verizon's calls about past due balances—even if the person is the customer or a non-customer friend or family member.[28]  The ways customers try to avoid collection activities are endless.[29] As explained by Meryl Friedman, one of Verizon's Rule 30(b)(6) designees:

> Just like people press 3 saying I'm not -- this is "you're calling the wrong number, it's not me," when, for the most part, from my own experience because I handle these all the time, it's a lie.  They don't want any more collection calls. . . . People lie all the time.  Just because someone presses a button doesn't mean that they're really not the right person.[30]

Consequently, there is no automated "opt out" or "do not call" option provided in the IVR

---

[26] *See* Exhibit 5; Boulanger 5th Decl., ¶ 9.

[27] *See* Exhibit 5; Boulanger 5th Decl., ¶ 9; Boulanger 1st Decl., ¶ 11.

[28] *See* Boulanger 5th Decl., ¶ 9; Friedman Dep., 110:12-25; 163:6-164:6; 195:22-197:16.

[29] *See* Boulanger 5th Decl., ¶ 10; Boulanger 1st Decl., ¶ 15; Friedman Dep., 110:12-25; 163:6-164:6.  Many times customers themselves assert Verizon is calling the wrong person or wrong number, demand that the calls stop (despite the fact Verizon is calling the customer's number and despite the terms of the Customer Agreement), and assert they do not even have an account with Verizon (despite the fact they do). *See* Boulanger 5th Decl., ¶ 10; *see also* Boulanger 1st Decl., ¶ 15.  It is also common for call recipients to ask Verizon to stop calling, but later ask for calls to resume.  *See* Boulanger 5th Decl, ¶ 15; *see also, e.g.*, Dr. Aron Report, ¶¶ 23, 24.

[30] *See* Friedman Dep., 163:10-15; 164:3-6.

script.[31]  As further explained by Ms. Friedman when making clear that there is nothing in the

IVR script indicating Verizon was truly calling a wrong number:

> We would never be able to know that until you speak to an agent.  That's not
> something that would ever be an automated system because each recipient who
> may say they're the wrong number needs to be vetted by a live person.[32]

By transferring a call recipient to an Agent, Verizon is not requiring call recipients to "opt out"

of additional calls as Plaintiff claims; but rather, they are transferred to enable Agents to

determine if changes need to be made to the account.[33]

## C.    Unreliability of Call Disposition Codes to Identify Wrong Numbers or Revocations of Consent.

Determining whether Verizon was calling a "wrong number" or whether a call recipient

revoked consent is an individualized, manual, and fact-intensive inquiry that cannot be

determined by looking solely at "key press" data contained in Verizon's calling records.[34]  In

particular, as relevant here, all the press 2, then 3 notations reveal is that an *unknown* call

recipient pressed 2, then pressed 3:  they do not reveal, among other things, (i) *who* answered the

call, (ii) *why* particular keys were pressed during the call, (iii) *who* pressed the keys, and (iv)

---

[31] *See* Exhibit 5; Boulanger 1st Decl., ¶¶ 11, 18; Friedman Dep., 195:22-197:16; Deposition of Kevin G. Jewell, dated June 2, 2021 ("**Jewell Dep.**") (attached as Exhibit 6 hereto), 187:7-13 (acknowledging that the IVR script does not contain the words "opt out," "revoke consent," or "do not call" ).  Also, Verizon does not ignore a wrong number "instruction" as Plaintiff contends (Pl. Brief, p. 1); but rather, Verizon's IVR script instructs the call recipient to speak with an Agent.  *See supra.*, n. 13.

[32] *See* Friedman Dep., 195:22-196:7.  Beyond verifying whether a CBR Number actually is a wrong number (and whether account changes need to be made), in some cases, the call recipient must provide the Agent with the specific number being dialed that needs to be removed because that number may not appear on the Agent's screen and, as such, the Agent would not otherwise know what number to remove. *See* Boulanger 5th Decl., ¶ 11.  In other cases, the customer presses 3 to get to an Agent in order to change a CBR Number on the account. *See* Boulanger 5th Decl., ¶ 16.I.

[33] *See supra.*, nn. 13, 31; *infra*, nn. 34, 35.

whether the key presses were attempts to avoid Verizon's calls.[35]  Furthermore, Verizon's call records contain various other codes describing what occurred during the calls ("**Call Disposition Codes**"),[36] including codes indicating that Verizon was *not* calling a wrong number and that the call recipient did not revoke consent—but was calling *and reached* a correct number.[37]

Plaintiff's proposed class relies entirely on specific Call Dispositions Codes generated by the IVR script after an unknown person who answered the call pressed certain buttons indicating that (i) this is not the customer identified in the IVR script (a press 2) and (ii) Verizon is calling the "wrong number" (a press 3).[38]  Plaintiff's proposed class completely ignores any other disposition codes, including those indicating that Verizon was calling a correct number. Plaintiff's proffered expert witness, Kevin G. Jewell ("**Mr. Jewell**"), demonstrates this very point and the unreliability of using the press 2, then 3 Call Disposition Codes as proof of wrong number calls or implied revocations of consent in his own reports.

For example, in the Expert Report of Kevin G. Jewell, dated May 3, 2021 ("**Jewell Report**") (attached as Exhibit 12 hereto), Mr. Jewell identified calls to 71,361 telephone

---

[34] *See* Boulanger 5th Decl., ¶¶ 10-17; Boulanger 1st Decl., ¶ 15; Friedman Dep., 195:1-198:25; *see generally* Dr. Aron Report, ¶¶ 74-102.

[35] *See* Exhibit 5; Boulanger 5th Decl., ¶ 10; Boulanger 1st Decl., ¶ 15; Friedman Dep., 195:1-198:25; Dr. Aron Report, ¶ 80; Jewell Dep. 105:19-106:15.

[36] Dr. Aron Report, ¶¶ 34-40, 56; Rule 30(b)(6) Deposition of Cheryl Boulanger, dated February 2, 2021 ("**Boulanger Dep.**") (attached as Exhibit 7 hereto), 83:12- 85:22; Friedman Dep., 191:6-193:2.

[37] Dr. Aron Report, ¶¶ 57, 94; Jewell Dep., 84:5-86:5; 90:23-91:19 & Ex. 3A to Jewell Dep. (attached as Exhibit 8 hereto); Declaration of Lorne George, Sr., dated May 21, 2021 ("**George, Sr. Decl.**") (attached as Exhibit 9 hereto); Declaration of Laurence Siegel, dated May 26, 2021 ("**Siegel Decl.**") (attached as Exhibit 10 hereto); *see also*, Dr. Aron Report, ¶¶ 74-102; Boulanger 5th Decl., ¶¶ 9-17; Boulanger 1st Decl., ¶¶ 14-15; Friedman Dep., 195:1-198:25.

[38] Pl. Brief, pp. 9-10; Jewell Report, ¶¶ 3, 17, 31, 35-53; Supplemental Expert Report of Kevin G. Jewell, dated May 31, 2021 ("**Jewell Supplemental Report**") (attached as Exhibit 11 hereto), ¶¶ 5, 9.

numbers during which a call recipient pressed 2, then 3 in the IVR script and to which Verizon

then made a *subsequent* call, which he referred to as "Group 2."[39]  Mr. Jewell later revised Group

2 to include 61,485 telephone numbers in the Jewell Supplemental Report.[40]  Plaintiff's proposed

class is comprised only of the telephone numbers in Mr. Jewell's revised Group 2.[41]  Mr. Jewell,

however, determined that—*despite call recipients pressing 2, then 3*—approximately 38% of the

Group 2 numbers (approximately 40% of revised Group 2) received calls in which there existed

*other* Call Disposition Codes that were potentially *inconsistent* with a "wrong number" call and,

impliedly, inconsistent with a revocation of consent.[42]  The real percentage is likely even higher

because there are *other* Call Disposition Codes that are inconsistent with wrong number calls or

revocations of consent contained in Verizon's calling records that Mr. Jewell did not even

---

[39] *See* Jewell Report, ¶ 17; Dr. Aron Report, ¶¶ 58, 59, & 62.

[40] *See* Jewell Report, ¶ 17; Jewell Supplemental Report, ¶ 9.  Mr. Jewell's "Groups" are further described in Verizon's Motion to Exclude his expert reports.  *See* Dkts. 211, 212.  For the purposes of this opposition, according to Mr. Jewell, "Group 1" contains calls made to telephone numbers in which the call recipient pressed 2, then 3.  *See* Jewell Report, ¶¶ 3, 15, 29.  Group 2 are subsequent calls to Group 1 numbers.  *See* Jewell Report, ¶¶ 3, 17, 31.  Group 3 are calls to Group 1 numbers wherein the call recipient allegedly was transferred to an Agent and orally informed Verizon it was calling the wrong number or asked Verizon to cease calling.  *See* Jewell Report, ¶¶ 3, 19, 32.  Group 4 are subsequent calls to Group 3 numbers.  *See* Jewell Report, ¶¶ 3, 21, 33.

[41] Pl. Brief, pp. 9-12; Jewell Report, ¶¶ 3, 17, 31, 35-53; Jewell Supplemental Report, ¶¶ 5, 9.

[42] *See* Jewell Report, ¶¶ 3, 17, 18, 30, 31, 53 & 54 (71,361 numbers in Group 2 minus 44,278 numbers in Group 2A equals 27,083); Jewell Supplemental Report, ¶¶ 9, 10 (61,485 numbers in revised Group 2 minus 36,800 numbers in revised Group 2A equals 24,685); Dr. Aron Report, ¶¶ 61-63; Jewell Dep. 84:5-86:5; 90:23-91:19; 143:24-145:18, & Ex. 3A (Exhibit 8); *see also* Dr. Aron Report, ¶¶ 82-90.  In his revised analysis, the percent of Group 2 phone numbers for which he found calls with dispositions that are potentially inconsistent with a "wrong number" was even higher at approximately 40%.  *See* Jewell Supplemental Report, ¶¶ 9, 10. The Call Disposition Codes Mr. Jewell used to identify dispositions that were potentially *inconsistent* with wrong number calls includes codes indicating that (i) the customer made a payment or promise to pay, (ii) Verizon had reached the "right party," (iii) the debt was disputed, and (iv) the account was authenticated.  *See* Jewell Report, ¶ 47; Jewell Dep., 87:11-19; 90:23-91:3, & Ex. 3A (Exhibit 8); Dr. Aron Report, ¶ 61.

consider or misunderstood.[43]

The unreliability of using the press 2, then 3 Call Disposition Codes also is shown by Mr. Jewell's further analysis of collection call remarks or notes contained in Verizon's Computer Assisted Collection System ("**CACS**"), which he used to create his "Group 3."[44]   To find qualifying calls for Group 3—which group Plaintiff does not seek to certify in her Motion—Mr. Jewell searched for certain terms in the CACS remarks or notes that could indicate a call recipient was transferred to an Agent and allegedly told the Agent Verizon was calling a wrong number or to cease calling.[45]   According to Mr. Jewell, 1,467 telephone numbers (which he later revised to 1,152 numbers) received *subsequent* calls from Verizon after a call recipient (i) pressed 2, then 3, (ii) was transferred to an Agent, and (iii) allegedly informed the Agent Verizon

---

[43] *See* Dr. Aron Report, ¶¶ 56, 57, 94-122; George, Sr. Decl., ¶¶ 3-7 and Exs. A and B attached thereto; Siegel Decl., ¶¶ 2, 3 & Ex. A attached thereto; Jewell Dep., 77:5-78:15; 122:20-133:24; 134:9-143:7.

[44] Boulanger 5th Decl., ¶¶ 12-17; Dr. Aron Report, ¶¶ 123-139.  During calls to customers whose service is at risk of interruption or termination based on non-payment, the system generates account remarks, but Agents may also choose to enter remarks from a drop down menu and make "free form" remarks or notes in CACS.  *See* Boulanger 5th Decl., ¶ 13; Friedman Dep., 26:12-27:18, 120:9-23.

[45] *See* Jewell Report, ¶¶ 3, 32, 55-59.  Although there may be standard acronyms and terms used by Agents when entering notes, there is no standard language or parameters Agents must follow. *See* Boulanger 5th Decl., ¶ 13; Friedman Dep., 26:12-27:18, 120:9-23.  Although the words "wrong number" and "stop calling" (or similar terms Mr. Jewell used) may appear in the remarks or notes, those words are subject to interpretation and, many times, do not mean that Verizon was calling a wrong number or calling a number Verizon had been asked to stop calling.  *See* Boulanger 5th Decl., ¶¶ 12-17; Dr. Aron Report, ¶¶ 123-139 (examples of purported "wrong number" or "stop calling" remarks identified by Mr. Jewell that mean something very different when understood in context).  Mr. Jewell admitted at his deposition that various sample notes he used to group telephone numbers were subject to interpretation.  *See* Jewell Dep. 157:10-173:3. Almost invariably, Agent notes must be reviewed in connection with the status of the account at the time, other account remarks, and the entire account history to determine what the notes actually mean.  *See* Boulanger 5th Decl., ¶¶ 12-17; Dr. Aron Report, ¶¶ 123-139; Friedman Dep., 195:1-198:25.

was calling the wrong number or to cease calling.[46]  Mr. Jewell referred to those telephone numbers as "Group 4," which group Plaintiff also does not seek to certify in her Motion.[47]  Mr. Jewell, however, determined that—*despite call recipients (i) pressing 2, then 3, (ii) being transferred to an Agent, and (iii) allegedly informing an Agent that Verizon was calling the wrong number or to cease calling,* approximately 37% of those telephone numbers (approximately 42% of the revised Group 4) received calls in which there existed *other* Call Disposition Codes that could indicate the telephone number was not a wrong number or the call recipient party did not orally revoke consent.[48]

## RELEVANT STANDARDS FOR CLASS CERTIFICATION

### A.     General Requirements for Class Certification under Federal Rule of Civil Procedure 23.

A court may certify a class if the proposed class satisfies all the requirements of Federal Rule of Civil Procedure Rule 23(a) and at least one of the reasons set forth in Rule 23(b).[49]  Rule 23(a) requires a class to meet the following four criteria: (1) the class must be "so numerous that joinder of all members is impracticable"; (2) "there must be questions of law or fact common to the class"; (3) "the claims or defenses of the representative parties must be typical of the claims

---

[46] *See* Jewell Report, ¶¶ 3, 21, 32, 33, 55-70; Jewell Supplemental Report, ¶¶ 11, 13; Dr. Aron Report, ¶¶ 64, 66.  Mr. Jewell, however, never looked at remarks indicating that Verizon had called the right party or that the call recipient did not revoke consent.  *See* Jewell Dep., 147:23-148:22; Dr. Aron Report, at ¶¶ 19, 99, 123-135.

[47] *See* Jewell Report, ¶¶ 3, 33; Jewell Supplemental Report, ¶¶ 5, 13.

[48] *See* Jewell Report, ¶¶ 21, 22 (1,467 numbers in Group 4 minus 922 numbers in Group 4A equals 545); Jewell Supplemental Report, ¶¶ 13, 14 (1,152 numbers in revised Group 4 minus 669 numbers in revised Group 4A equals 483); Jewell Dep. 177:11-178:16; *see also* Dr. Aron Report, ¶¶ 23, 24, 123-139.  In his revised analysis, approximately 42% of the telephone numbers received calls in which there existed *other* Call Disposition Codes that could indicate the telephone number was not a wrong number or the call recipient party did not orally revoke consent.  *See* Jewell Supplemental Report, ¶¶ 13, 14.

[49] *See* Smilow v. Sw. Bell Mobile Sys., Inc., 323 F.3d 32, 38 (1st Cir. 2003).

or defenses of the class"; and (4) the representative parties must "fairly and adequately protect the interests of the class."[50]  With respect to Rule 23(b)(3) in particular, the "questions of law or fact common to class members" must "predominate over any questions affecting only individual members," and a class action must be superior to other available methods for fairly and efficiently adjudicating the controversy.[51]  A court must conduct a "rigorous analysis" under Rule 23 and may look behind the pleadings, predict how specific issues will become relevant to facts in dispute, and conduct a merits inquiry if the merits overlap with the Rule 23 criteria.[52]

**B.      Ascertainability and "Administrative Feasibility" in the First Circuit.**

Beyond Rule 23 requirements, a plaintiff must prove the proposed class is "ascertainable" and, although all class members need not be identified at the outset, the class must be determinable by "stable and objective factors." [53]   Contrary to Plaintiff's assertion, "administrative feasibility" is an element of ascertainability in the First Circuit.[54]  In In re Nexium Antitrust Litig., the First Circuit held that a court "must be satisfied" the mechanism proposed to identify class members (i) will be "administratively feasible" *and* (ii) protects a

---

[50] FED. R. CIV. P. 23(a)(1)–(4).

[51] FED. R. CIV. P. 23(b)(3).

[52] *See* Smilow, 323 F.3d at 38 ("rigorous analysis"); In re New Motor Vehicles Canadian Exp. Antitrust Litig., 522 F.3d 6, 25 (1st Cir. 2008) (look behind pleadings).

[53] *See* Kent v. SunAmerica Life Ins. Co., 190 F.R.D. 271, 278 (D. Mass. 2000).

[54] *Compare* Pl. Brief, p. 12 ("Although administratively feasibility [sic] is not an element of ascertainability in the First Circuit . . . ") *with* In re Nexium Antitrust Litig., 777 F.3d 9, 19 (1st Cir. 2015) ("The court may proceed with certification so long as this mechanism will be 'administratively feasible[.]'") (citation omitted); In re Asacol Antitrust Litig., 907 F.3d 42, 52 (1st Cir. 2018) (*citing* In re Nexium Antitrust Litig., *supra.,* and noting "In assessing efficiency and fairness, we have recognized that a class may be certified notwithstanding the need to adjudicate individual issues so long as the proposed adjudication will be both 'administratively feasible' and 'protective of defendants' Seventh Amendment and due process rights.'"); *see also* Cherry v. Dometic Corp., 986 F.3d 1296, 1302 (11th Cir. 2021) ("Like the Third Circuit, the First and Fourth Circuits require proof of administrative feasibility as a prerequisite for certification.").

defendant's Seventh Amendment and due process rights to certify a class.[55]  In so holding, the

First Circuit relied on Carrera v. Bayer Corp., where the Third Circuit explained:

> Ascertainability mandates a rigorous approach at the outset because of the key
> roles it plays as part of a Rule 23(b)(3) class action lawsuit.  First, *at the
> commencement of a class action*, ascertainability and a clear class definition allow
> potential class members to identify themselves for purposes of opting out of a
> class. Second, it ensures that a defendant's rights are protected by the class action
> mechanism. Third, it ensures that the parties can identify class members in a
> manner consistent with the efficiencies of a class action. . . .  A plaintiff does not
> satisfy the ascertainability requirement *if individualized fact-finding or mini-trials
> will be required to prove class membership.*  "Administrative feasibility means
> that identifying class members is a manageable process that does not require
> much, *if any*, individual factual inquiry."[56]

A class cannot be certified when class members are "impossible to identify prior to

individualized fact-finding and litigation."[57]  Stated another way, *at the time of certification*,

there must be a "reasonable and workable" plan for how a plaintiff will prove class membership

"in a manner that is protective of the defendant's constitutional rights and does not cause

individual inquiries to overwhelm common issues." [58]   In particular, a defendant has a

fundamental due-process right to challenge both the makeup of a class as defined and "the proof

used to demonstrate class membership as it does not challenge the elements of a plaintiff's

claim[.]"[59]  A class action may not be certified "in a way that eviscerates this right or masks

individual issues."[60]  Also, a court needs to know who will receive notice, who will share in any

---

[55] In re Nexium Antitrust Litig., 777 F.3d at 19 (*citing* Carrera v. Bayer Corp., 727 F.3d 300, 307 (3d Cir. 2013)).

[56] *See* Carrera, 727 F.3d at 307-08 (internal citations omitted) (emphasis added).

[57] *See* Crosby v. Social Sec. Admin., 796 F. 2d. 576, 580 (1st Cir. 1986).

[58] *See* In re Asacol Antitrust Litig., 907 F.3d at 58.

[59] *See* Carrera v. Bayer Corp., 727 F.3d at 307.

[60] *See id.*

recovery, and who will be bound by any judgment.[61]  These requirements are well known by this Court.[62]

ARGUMENT

## I.     THE PROPOSED CLASS IS NOT ASCERTAINABLE.

The Court should deny Plaintiff's Motion because Plaintiff failed to prove the proposed "Group 2" class is ascertainable.   To support ascertainability, Plaintiff relies only on (i) Verizon's calling records and data indicating a call recipient pressed 2, then 3, and (ii) data obtained from Interactive Marketing Solutions ("**IMS**") ("**Plaintiff's Ascertainability Data**").[63] Plaintiff does not provide *any* mechanism—let alone an administratively feasible one—by which the parties and the Court can identify the actual names and addresses of the putative class members.   In addition, membership in Plaintiff's proposed class cannot be determined by Plaintiff's Ascertainability Data without individualized inquiries. Plaintiff has the burden to prove the proposed class is ascertainable *at the time of class certification* by a preponderance of the evidence.[64]  Plaintiff cannot simply rely on Mr. Jewell's Group 2 list of telephone numbers to ascertain a class.   Plaintiff's failures of proof here give this Court ample grounds to deny Plaintiff's Motion even before analyzing the other required Rule 23 factors.

### A.     Plaintiff Has Not Provided Any Method to Determine the Identities of Putative Class Members

*See* Hebert v. Vantage Travel Srv., Inc., 334 F.R.D. 362, 370 (D. Mass. 2019) (*citing among other sources* Crosby, *supra.*) (Casper, J.).

[62] *See e.g.*, Kent, 190 F.R.D. at 278-279; Hebert, 334 F.R.D. at 370 (D. Mass. 2019) (*citing* Crosby, *supra.*).; Shanley v. Cadle, 277 F.R.D. 63, 68 (D. Mass. 2011) (*citing* Crosby, *supra.*); Sandoe v. Boston Sci. Corp., 333 F.R.D. 4, 8 (D. Mass. 2019) (*citing* Crosby, In re Asacol Antitrust Litig., and Shanley, *supra*.); Plastic Surgery Assocs., S.C. v. Cynosure, Inc., 407 F. Supp. 3d 59, 73 (D. Mass. 2019) (Casper, J.).

[63] Pl. Brief, p. 12.

[64] *See* In re Nexium Antitrust Litig., 777 F.3d at 19.

In the context of a TCPA class action concerning alleged non-customers, a plaintiff must proffer sufficient evidence of who actually answered a defendant's telephone calls to ascertain a class under Rule 23.[65]  Stated another way, failure to provide a method to determine the actual *identities* of the putative class members prevents an ascertainability finding.[66]  For example, in Jamison v. First Credit Services, Inc., the District Court for the Northern District of Illinois denied class certification in a TCPA cases (arising in a debt-collection setting) because, among other things, the plaintiff did not proffer a viable method of determining the identity of those actually receiving the defendant's telephone calls.[67] As explained by the District Court:

> For purposes of the TCPA a subscriber is not just the regular user of the cellphone; rather, a subscriber is the person subscribing to the called number at the time the call is placed.  A search of defendants' records may identify who the defendants intended to call.  However, as Jamison and *Soppet* demonstrate, debt collectors do not always call who they intend to call. . . .  As a result[,] Jamison's solutions are insufficient to identify the regular user of a particular wireless number at the specific point in time [defendants] placed calls that were violative of the TCPA.[68]

---

[65] *See* Jamison v. First Credit Servs., Inc., 290 F.R.D. 92, 109 (N.D. Ill. 2013) (failure to identify "called party" for TCPA purposes prevents ascertainability);  Stalley v ADS Alliance Data Sys., Inc., 296 F.R.D. 670, 680 (M.D. Fla. 2013); Haight v. Bluestem Brands, Inc., No. 6:13-CV-1400-ORL-28-KRS, 2015 WL 12830482, * 5 (M.D. Fla. May 14, 2015) (rejecting approval of a settlement class based in part on failure to identify who actually received telephone calls); *see also* Wilson v. Badcock Home Furniture, 329 F.R.D. 454, 457-58 (M.D. Fla. 2018) (although denying certification on predominance grounds, noting that inability to definitely determine who actually answered a call and stated "wrong number" was a "weakness" in plaintiff's proposal to identify class members).

[66] *See* Karhu v Vital Pharms., Inc., No. 13–60768–CIV, 2014 WL 815253, *3 (S.D. Fla. Mar. 3, 2014) ("Because Karhu has failed to propose a realistic method of identifying the individuals who purchased Meltdown, he has failed to show that the Proposed Classes are sufficiently ascertainable."), *aff'd* 621 F. App'x 945, 947 (2015); Brantley v. Handi-House Mfg. Co., CV 617-089, 2018 WL 3613998, *3 (S.D. Ga. July 27, 2018) (defendant's records not useful in identifying names of employees).

[67] *See* Jamison, 290 F.R.D. at 109.

[68] Jamison, 290 F.R.D. at 109 (footnotes and citations omitted); Vigus v. S. Ill. Riverboat/Casino Cruises, Inc., 274 F.R.D. 229 (S.D. Ill. 2011) (finding class not ascertainable because "it would be necessary to identify the people assigned to those numbers at the times the allegedly offending

The United States District Court for the Middle District of Florida ("**Middle District**") faced a similar situation in Haight v. Bluestem Brands, Inc., where a plaintiff sought preliminary approval of a TCPA settlement class arising out of the defendant's debt-collection calls.[69]  The Middle District denied approval of the proposed settlement class—which was comprised of persons who received the defendant's telephone calls—because, among other things, the plaintiff did not prove that "the identities of the persons 'who received' calls in violation of the TCPA" could be "identified from [the defendant's records]."[70]  In doing so, the Middle District concluded it "should not certify" a class without "evidentiary assurances that an administratively feasible method exists to identify individuals who 'received' the calls at issue[.]"[71]  Such assurances are required because a court needs to give class members notice of the proceeding, and an opportunity to object, opt out, and understand who will be bound by any judgment.[72]

Likewise, in Stalley v ADS Alliance Data Systems, Inc., the plaintiff sought to certify a

---

calls were made, which may not be the people currently assigned to those numbers.").  Like the Seventh Circuit in Soppet v. Enhanced Recovery Co., LLC, 679 F.3d 637, 642 (7th Cir. 2012), in the First Circuit, the "called party" for TCPA purposes means the person subscribing to the called number at the time the call is made and not the "intended recipient" of the call.  *See, e.g., Davis v. Diversified Consultants, Inc.*, 36 F. Supp. 3d 217, 223-24 (D. Mass. 2014).  Jamison followed a clear and convincing standard; however, the holding is still persuasive and analogous here. Ultimately, Plaintiff has failed to prove ascertainability by a preponderance of the evidence or any other measurable evidentiary standard.  *See supra*, at p. 6; *infra.*, at pp. 22-23.

[69] *See* Haight, 2015 WL 12830482, at *1-3.

[70] *See id.* at *4-5.

[71] *See id.* at *5; *contra Cherry*, 986 F.3d at 1304 ("hold[ing] that administrative feasibility is not a requirement for certification under Rule 23" in the Eleventh Circuit).

[72] *See* Crosby, 796 F.2d at 580 ("Because the standard of 'within a reasonable time' makes class members impossible to identify prior to individualized fact-finding and litigation, the class fails to satisfy one of the basic requirements for a class action under Rule 23[.] . . .  Without an identifiable class of disability claimants, we cannot grant class-wide relief in this case either in the form of granting notices or compiling status reports.") (*citing among other sources,* 7 C. Wright & A. Miller, Federal Practice and Procedure, 1760, at 581 (2nd ed. 1972) (description of class must be sufficiently definite so that it is administratively feasible to determine whether a particular individual is a member)).

class of persons who received telephone calls from a defendant in alleged violation of the Florida Security of Communications Act ("**FSCA**").[73]  The defendant contended that the plaintiff's class was not ascertainable because it was not feasible to determine "who actually picked up the phone and answered" the calls and the identity of the alleged injured class members (who may have been recorded without consent) could not be identified.[74]  The Middle District agreed with the defendant, determined that the proposed class was not ascertainable, and denied certification.[75]

Much like the plaintiffs in <u>Jamison</u>, <u>Haight</u>, and <u>Stalley</u>, Plaintiff has not presented the Court with any method to determine who owned the telephones on which the calls were received, or who actually answered the calls and pressed the buttons in the IVR script.  When the wheat is cut from the chaff, Plaintiff may not ascertain a class on this record simply by providing a list of telephone numbers; but that is all Plaintiff has done.[76]  Although Plaintiff does not even identify or suggest using any third-party reverse lookup vendor in her brief, Verizon's expert Dr. Debra Aron explains in her report that there is no official or dispositive directory or database of wireless telephone subscribers,[77] third-party vendors who offer reverse lookup services are unreliable, and any data obtained from them would require individualized inquiries to verify.[78]  Likewise, although Plaintiff never even suggests doing so in her brief, Dr. Aron explains that sending subpoenas to other wireless carriers is unreliable and would require individualized

---

[73] 296 F.R.D. 670, 677-80 (M.D. Fla. 2013).

[74] *id*. at 679.

[75] *See id.* at 680.

[76] *See* Pl. Brief, p. 12 (the class "has already been ascertained.") and p. 13 ("Plaintiff's expert was able to systematically identify each class member by their cellular telephone number[.]"); *see also* Dr. Aron Report, ¶¶ 161, 179.

[77] *See* Dr. Aron Report, ¶ 162.

[78] Dr. Aron Report, ¶¶ 161-178.

inquiries.[79]

Nor can Plaintiff use the IMS data to identify putative class members.  In her brief, Plaintiff discusses what she expects Verizon to argue about Mr. Jewell's use of IMS data, cites to and relies on Dr. Aron's discussion of whether IMS, Neustar, or Telcordia can or cannot reliably *identify numbers* as wireless or wirelines, and asserts that courts have relied on "the same data to identify cellular telephone numbers in TCPA actions for years."[80]  Those are all red herrings. Apart from being unreliable to determine whether a number was wireless or a wireline at the time of any call,[81] the IMS data does not provide names and addresses of who owned or used the telephones on which Verizon's calls were received, or who answered any of the calls and pressed any buttons in the IVR script at issue in this case.[82]  The IMS data only purports to indicate whether a telephone number was listed as "wireless" or a "wireline"—it does not identify the user or owner of the actual telephone to which the calls in this case were routed.[83]  Plaintiff's failure to proffer *any* means of identifying putative class members is—in and of itself—a solid basis on which to deny class certification.

---

[79] Dr. Aron Report, ¶¶ 179-193.

[80] *See* Pl. Brief, p. 13.

[81] *See* Dr. Aron Report, ¶¶ 150-160; *see also* Dkt. 212 (wherein Verizon explains why Mr. Jewell's assertions that (i) the IMS data is reliable to prove the wireless status of any number at the time it was called and (ii) such data is "widely used" by the Federal Communications Commission are incorrect).

[82] *See* Dr. Aron Report, ¶¶ 150-160.

[83] *See* Deposition of Dr. Debra Aron, dated June 3, 2021 (attached as Exhibit 13 hereto), 61:19-63:21, 76:19-78:11.  The IMS data would not have identified Plaintiff's provider because she was not a customer of the company to which the number was assigned; instead, Plaintiff was a customer of another provider that relied on the first company for assignment of phone numbers to the provider's service.  *See Breda v. Cellco P'Ship*, 934 F.3d 1, 5 (1st Cir. 2019).

**B.** **Certification Should Be Denied Because Class Membership Cannot Be Ascertained Without Individualized Inquiry**

A class should not be certified when a court must engage in individualized determinations of disputed fact to ascertain class membership.[84] This is particularly true for TCPA cases in which a plaintiff seeks to certify a class based on "wrong number" or "do not call" notations contained in a defendant's records that are in dispute.[85] For example, in Sliwa v. Bright House Networks LLC, the plaintiff sought to certify a class of non-customers who received telephone calls after the defendant had documented in its records that the numbers called were wrong numbers for the customers they were trying to reach.[86] To identify the proposed class, the plaintiff's expert presented a list of telephone numbers that received additional calls after the defendants had coded the number as "Bad Phone" and "Incorrect Number-Live Answer."[87] The defendants, however, presented evidence that the relevant codes did not necessarily mean the defendants were calling the wrong number.[88] Based on this

---

[84] See Brantley, 2018 WL 3613998 at *3.  Here, a court's analysis of ascertainability and predominance may become intertwined.  See, e.g., Kent, 190 F.R.D. at 279 ("It turns out also, on further analysis, that the problem of ascertainability defeats plaintiffs' efforts to clear the hurdles of commonality, typicality, and predominance . . . "; plaintiffs' effort to define the class raises individualized questions, and "[c]ommon questions regarding typical plaintiffs, let alone a finding of a predominance of common questions regarding typical plaintiffs, are . . . hard to find in such a grab-bag of individualized factual findings").

[85] See Fennell v. Navient Sols., LLC, No. 6:17-CV-2083-ORL-37-DCI, 2019 WL 385481, *5 (M.D. Fla. June 14, 2019); Sliwa v. Bright House Networks LLC, 333 F.R.D. 255, 271-272 (M.D. Fla. 2019); Morgan v. Adventist Health Sys./Sunbelt, Inc., No. 6:16-CV-1342-ORL-78-DCI, 2020 WL 1674307, *2-3 (M.D. Fla. Jan. 15, 2020) (hereinafter "Adventist Health"); Tillman v. Ally Financial, Inc., No. 2:16-CV-313-FTM-99-CM, 2017 WL 7194275, *7 (M.D. Fla. Sept. 29, 2017); Wilson, 329 F.R.D. at 457-58 (deciding issue on predominance grounds, but expressing concerns about ascertainability).

[86] See Sliwa, 333 F.R.D. at 269.

[87] See id. at 270-71.  The Middle District concluded that the codes were not reliable as proof of wrong numbers.  Id. at 271-72.

[88] See id. at 271.

fundamental factual dispute, the Middle District denied class certification and, when doing so, explained:

> Because the BP [Bad Phone] Code assigned to a phone number does not in and of itself mean or establish that Defendants dialed a wrong number, determining whether Defendants called a particular phone number after they "had already documented the number as a wrong number in their records" would require individualized inquiries as to why each phone number was assigned a BP Code. Indeed, when presented with similar evidence regarding "wrong number" call log designations, this Court recognized that "in the debt collection industry 'wrong number' oftentimes does not mean non-consent because many customers tell agents they have reached the wrong number, though the correct number was called, as a way to avoid further debt collection." The difficulty in ascertaining this information is compounded by the fact that the phone numbers at issue were initially provided to [Defendant] Bright House by consenting customers.[89]

The Middle District came to the same conclusion in <u>Tillman v. Ally Fin. Inc.</u> based on evidence that "wrong number" and "do not call" notations do not always mean "non-consent."[90] Simply put, when in dispute, these notations "are insufficient to establish on a class-wide basis without individualized inquiry that a defendant made a call in violation of the TCPA," and this prevents a court from ascertaining class membership.[91] Much like the calls at issue in <u>Sliwa</u> and <u>Tillman</u>, whether the calls at issue in this case were made to wrong numbers (or whether such persons impliedly revoked consent) is in dispute and would require individualized inquiries to determine, as discussed in greater detail below.[92] Plaintiff has not proffered sufficient evidence or any

---

[89] *See id*. at 271-72 (citations omitted). In so doing, the Middle District concluded that the plaintiff's expert's creation of a group of numbers that contained data indicating the defendant was not calling a wrong number was a tacit admission that the proposed class was not certifiable based on individualized questions about the calls. *Id*.

[90] No. 2:16- CV-313-FTM-99CM, 2017 WL 7194275, at *7 & n. 11 (M.D. Fla. Sept. 29, 2017).

[91] <u>Tillman</u>, 2017 WL 7194275, at *7; *see also id*. at *7, n. 11; <u>Fennell</u>, 2019 WL 385481 at *5 (defendant presented evidence that "stop calling" notations produced false positive results and, as such, "revoked consent" class was not ascertainable );

[92] *See* **ARGUMENT, II: PLAINTIFF'S PROPOSED CLASS DOES NOT SATISFY FED. R. CIV. P. 23(B)(3) PREDOMINANCE OR SUPERIORITY REQUIREMENTS**, *infra.*, at pp. 24-35.

method to ascertain class membership by a preponderance of the evidence or any other standard.

    c.    **Plaintiff's Ascertainability Argument Relies on Inapposite and Distinguishable Case Law**

The cases cited and relied on by Plaintiff to support her ascertainability argument are inapposite and unpersuasive.  For instance, <u>Clough v. Revenue Frontier, LLC</u> and <u>George v. Shamrock Saloon II LLC</u> contain only cursory discussions about ascertainability, and both cases concern TCPA texting—as opposed to wrong number or revocation of consent—class actions.[93] All the <u>Clough</u> Court stated was that the defendant produced a list of numbers that could be used to identify class members—without revealing how.[94]  Nor did the <u>George</u> Court reveal how class members could be identified, and the defendant in that case did not "contest[] the ability to identify the class."[95] Moreover, unlike here, the defendants in both <u>Clough</u> and <u>George</u> did not produce evidence that they had consent to send the text messages to the subject numbers.[96] <u>Sandusky Wellness Center, LLC v. Medtox Scientific, Inc.</u> is a TCPA "junk fax" case in which the Eighth Circuit Court of Appeals concluded that the facsimile logs contained sufficient

---

[93] *See* <u>Clough</u>, No. 17-CV-411-PB, 2019 WL 2527300, *3 (D.N.H. June 19, 2019); <u>George</u>, No. 17-CV-6663 (RA), 2020 WL 133621, *8 (S.D.N.Y. Jan. 13, 2020).  Plaintiff cites three other cases for the general proposition that TCPA class actions are certifiable; however, those cases are inapposite and unpersuasive.  *See* <u>Krakauer v. Dish Network, L.L.C.</u>, 925 F.3d 643 (4th Cir. 2019) (TCPA telemarketing class action concerning "Do-Not-Call Registry" wherein the court was presented with data connecting numbers to putative class members' names and address, and consent to call was not at issue); <u>Meyer v. Portfolio Recovery Assocs., LLC</u>, 707 F.3d 1036 (9th Cir. 2012) (TCPA class action where the numbers at issue were obtained via skip-tracing, and consent to call was not obtained prior to calls being placed); <u>Cordoba v. DirectTV, LLC</u>, 942 F.3d 1259 (11th Cir. 2019) (TCPA telemarketing class action where the Eleventh Circuit concluded that the district court abused its discretion in certifying class because individualized questions of whether consumers requested to be placed on internal do-not-call list predominated).

[94] *See* 2019 WL 2527300 at *3.

[95] 2020 WL 133621 at *8.

[96] *See* <u>Clough</u>, 2019 WL 2527300 at *7; <u>George</u>, WL 133621 at * 6, n. 9.

information to identify the recipient of the subject facsimile.[97]  Like <u>Clough</u> and <u>George</u>, however, the defendant—unlike Verizon here—did not challenge whether it had consent to send the subject facsimiles.[98]  That distinction is critical as the Middle District explained in <u>Sliwa</u>:

> In arguing that his method for identifying class members is administratively feasible, Plaintiff heavily relies upon cases where defendants sent unsolicited fax advertisements to plaintiffs in violation of the TCPA.  While the courts in those cases did certify the proposed classes based upon a list of phone numbers to which the defendants sent unsolicited faxes, the courts in those TCPA fax cases were not faced with the same individualized issues present in this case.  Unlike this case, those cases do not involve the interpretation of "wrong number" call log designations, nor do they involve the issues surrounding consent and arbitration discussed *infra*.  *The Court therefore finds these authorities inapposite.*[99]

The question for this Court is not whether *any* TCPA case should be certified as a class action. Rather, the question is whether *this* TCPA case should be certified as a class action.  Considering Plaintiff failed to present any method—let alone an administratively feasible one—to ascertain membership in her proposed class, the answer to that ultimate question is a resounding "no."

## II. PLAINTIFF'S PROPOSED CLASS DOES NOT SATISFY FED. R. CIV. P. 23(B)(3) PREDOMINANCE OR SUPERIORITY REQUIREMENTS.

Common questions of law or fact predominate over individual questions only if liability and damages can be established through common proof.[100]  A court "must formulate some prediction as to how specific issues" will be resolved to determine whether common issues predominate.[101] The predominance inquiry is "'far more demanding'" than the commonality

---

[97] 821 F. 3d. 992, 997-998 (8th Cir. 2018).

[98] *See generally id.*

[99] 333 F.R.D. at 272, n. 16 (emphasis added) (citations omitted).

[100] *See* <u>In re Nexium Antitrust Litig.</u>, 777 F.3d at 18; <u>Sandoe</u>, 333 F.R.D. at 9.

[101] <u>In re New Motor Vehicles Canadian Export Antitrust Litig.</u>, 522 F.3d 20 (internal quotation marks and citation omitted); *see also* <u>Sandoe</u>, 333 F.R.D. at 9.

requirement in Rule 23(a).[102]   The party seeking class certification bears the burden of affirmatively demonstrating compliance with Rule 23(b)(3) requirements.[103]   Plaintiff manifestly failed to do so here.

Plaintiff asserts that only two common issues exist in this case: (1) whether Verizon's collection calls qualify as prerecorded voice calls under the TCPA, and (2) whether an alleged "wrong number" (press 2, press 3) key press during a collection call revokes consent to call the number again.[104]   Considering Verizon stipulated that all outbound calls at issue in this case were preceded by a prerecorded message (*i.e.*, the IVR script), the first common issue is irrelevant here and begs the question of whether common issues predominate.   Indeed, according to Plaintiff, the "overriding" common issue is whether an alleged "wrong number" key press (press 2, press 3) is a "reasonable method" of revoking consent under the TCPA, which can be determined without individualized inquiries.[105]   Plaintiff argues that pressing 2, then 3 in response to an IVR prompt for indicating "wrong number" in and of itself revokes consent to call regardless of whether Verizon, in fact, reached a wrong number.   She relies on these Call Disposition Codes as implied proxies for revocations of consent.   There are several reasons why they are not, and revocation of consent cannot be determined through common proof in this case.

First, as discussed, by pressing 2, then 3 the call recipient is, at most, indicating "wrong number."   There are no words in the IVR script by which call recipients can indicate revocation

---

[102] *See* In re New Motor Vehicles Canadian Export Antitrust Litig., 522, F.3d at 20 (*quoting* Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 624 (1997)).

[103] Sandoe, 333 F.R.D. at 9.

[104] Pl. Brief, p. 2.

[105] Pl. Brief, p. 18.

of consent—clearly or otherwise.[106]   Second, as shown by Mr. Jewell himself and corroborated by Dr. Aron, these key presses are not even reliable proof that Verizon had called a "wrong number" without further individualized inquiries.[107]   Plaintiff would have the court ignore the unreliability of "wrong number" key presses, arguing it is irrelevant since 2 then 3 revokes consent even if it is not a wrong number. But certainly, if the key presses do not constitute affirmative class-wide proof of what they are actually supposed to indicate—"wrong numbers"—, they cannot possibly be used to prove class-wide revocation of consent.   Third, pressing 2 then 3 does not meet the "reasonable method" standard for revoking consent.

Remarkably, despite basing her predominance argument on the "reasonable method" standard for revoking consent, Plaintiff does not describe the standard or discuss how the courts interpret it.   Of course, non-customers[108] may revoke consent to call their own telephone numbers using any "reasonable method"; however, a non-customer must "clearly express his or her desire not to receive further calls" when doing so.[109]   To assess reasonableness in this context, a court should "look to the totality of the facts and circumstances surrounding" the

---

[106] The key presses alone, however, are not even admissible to prove the number called was in fact a "wrong number" because the unknown person pressing the buttons was not under a business duty "to make that declaration" and, therefore, the "assertion" or "indication" is rank hearsay.  *See* Wilson, 329 F.R.D. at 458, n. 3; U.S. v. Vigneau, 187 F.3d 70, 75 (1st Cir. 1999) ("[T]he business records exception does not embrace statements contained within a business record that were made by one who is *not* a part of the business if the embraced statements are offered for their truth.").   Indeed, the only alleged possible "assertion" made when a call recipient presses 2, then presses 3 is not even an assertion—it is at best an indication (that raised an unanswered question) that Verizon was calling a "wrong number" based on keys pressed by an unknown person.

[107] *See supra.*, at pp. 9-13.

[108] Customers may not revoke consent to call their own CBR Numbers.  *See supra.*, at p. 3 and *infra.*, at n. 131.

[109] *See* In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, 30 FCC Rcd. 7961, 7997 (July 10, 2015), *available at* https://docs.fcc.gov/public/attachments/FCC-15-72A1_Rcd.pdf ("**2015 Order**").

alleged revocation and means used.[110]  Consent is revoked for TCPA purposes when the words used by a call recipient informed the calling party or gave the calling party reason to know that the call recipient was revoking consent.[111]

Plaintiff utterly fails to meet the "reasonable method" standard for anyone other than herself.[112]  She does not even present a trial plan to determine how this issue will be determined through common proof.[113]  Here, the call recipients in Plaintiff's proposed class (Mr. Jewell's Group 2) only pressed 2, then 3; *they did not actually speak with anyone.*  Moreover, revocation of consent must be clear and unambiguous and implied revocations do not satisfy the "reasonable method" standard relied on by Plaintiff.[114]  As concisely stated by the United States Bankruptcy Court for the Middle District of Florida, "implicit revocation will not do."[115]

---

[110] 2015 Order at 7996, n. 233; *see also* <u>Silver v. Pa. Higher Ed. Assistance Agency</u>, No. 14-cv-00652-PJH, 2020 WL 607054, *16 (N.D. Cal. Feb. 7, 2020) (denying TCPA class certification based on failure to prove common questions concerning revocation of individual questions).

[111] *See* <u>Dixon v. Monterey Fin. Servs., Inc.</u>, No. 15-cv-03298-MMC, 2016 WL 3456680, *3 (N.D. Cal. June 24, 2016).

[112] Verizon admits that an Agent made a mistake by not removing Plaintiff's number as a CBR Number after the Agent spoke with her and determined that Verizon was calling a wrong number.  *See* Dkt 17, p. 12.

[113] *See In re Pharm. Indus. Average Wholesale Price Litig.*, 588 F.3d 24, 40 n.16 (1st Cir. 2009) (Rule 23 was amended in 2003 "to address the 'critical need' to 'determine how the case will be tried,'"; "[t]he drafters observed that '[a]n increasing number of courts require a party requesting class certification to present a 'trial plan' that describes the issues likely to be presented at trial and tests whether they are susceptible to class-wide proof.'") (citations omitted).

[114] *See* <u>Cholly v. Uptain Grp., Inc.</u>, No. 15 C 5030, 2015 WL 9315557, *3 (N.D. Ill. Dec. 22, 2015) (explaining that filing for bankruptcy and having the bankruptcy court send the defendant notice of defendant's bankruptcy petition was, at best, an ineffective *implicit* revocation); <u>Welch v. Green Tree Servicing LLC (In re Runyan)</u>, 530 B.R. 801, 807 (Bankr. M.D. Fl. 2015) (holding that plaintiffs did not revoke consent by telling caller to direct calls to their lawyer); <u>Barnett v. Bank of Am., N.A.</u>, No. 3:20-CV-272-RJC-DSC, 2021 WL 2187950, *1, *4-5 (W.D.N.C. May 28, 2021) (plaintiff's request to be contacted by mail and statement that "he would contact the defendant when he was able to pay" insufficient to qualify as revocation of consent).

[115] *See* <u>Welch</u>, 30 B.R. at 807 (*citing* <u>Osorio v. State Farm Bank, F.S.B.</u>, 746 F.3d 1242, 1255 (11th Cir. 2014)).

Plaintiff asserts that "consent" is an affirmative defense that should not prevent class certification.[116] She is wrong. Plaintiff has the burden at class certification to prove that revocation of consent—direct or implied—is susceptible of common proof.[117] As the United States District Court for the Northern District of California ("**Northern District**") explained in Silver v. Pennsylvania Higher Ed. Assistance Agency:

> With respect to his second assertion [that the defendant did not prove revocation of consent was an individualized inquiry], plaintiff failed to identify any authority that the threshold evidentiary showing of consent borne by defendant required to put such affirmative defense at issue under Rule 23(b)(3)'s predominance analysis extends to *revocation* of consent. The rationale behind placing that threshold obligation upon defendant is premised upon the Ninth Circuit's determination that "prior express consent," for purpose of the TCPA, is an affirmative defense, which is an element of a claim that a defendant bears the burden of showing in response to a plaintiff's prima facie case. Here, a revocation of such consent— which would *reestablish liability* under Title 47 U.S.C. § 227(b)—is a factual issue that, under any ordinary showing of liability, plaintiff would bear the burden of proving as part of his prima facie case.[118]

Verizon has shown it had consent to call the CBR Numbers at issue; therefore, Plaintiff bears the burden to show clear and unambiguous revocation of consent and to do so on a class-wide basis.

---

[116] *See* Pl. Brief, p. 19, n. 15.

[117] *See* Silver, 2020 WL 607054 at *16-17; Blair v. CBE Grp., Inc., 309 F.R.D. 621, 630 (S.D. Cal. 2015) ("[T]he Court must determine whether the issue of consent is a common issue with a common answer that predominates over any individual issues. Courts have recognized that similar TCPA actions involving debt collections 'require extensive individual fact inquiries into whether each individual gave "express consent" by providing their wireless number to the creditor during the transaction that resulted in the debt owed.' The evidence offered by Defendant underscores the need for individualized inquiries to determine whether a particular class member provided express consent to receive phone calls from Defendant.") (internal citation omitted); Ung v. Universal Acceptance Corp., 319 F.R.D. 537, 540-41 (D. Minn. 2017) (finding that "the issue of consent is unique to each individual class member," and there was no predominance because there were "'nearly endless'" permutations of consent-related fact patterns for each putative class member) (quoting Comcast Corp. v. Behrend, 569 U.S. 27, 37-38 (2013); Ginwright v. Exeter Fin. Corp., 280 F. Supp. 3d 674, 688 (D. Md. 2017) ("Whether an Exeter customer provided a cell phone number on such forms, or in oral conversations with Exeter, would differ on a case-by-case basis, and certainly whether such a customer revoked consent, whether orally or in writing, is an individualized question.").

[118] 2020 WL 607054 at *16 (emphasis in original).

Even if Verizon had any burden at trial concerning revocation (which it does not), that does not eliminate this Court's inquiry into the issue when assessing whether to certify a class under Rule 23(b)(3).[119]  That is because the press 2, then press 3 Call Disposition Codes cannot be used as common proof of "wrong numbers" or a "lack of consent" in TCPA collection call cases as individualized questions concerning each call dwarf any proposed common issues.  For instance, in Wilson v. Badcock Home Furniture, a case in which the plaintiff was represented by one of Plaintiff's counsel here, the Middle District denied class certification, concluding that common questions did not predominate over individuals questions despite the "wrong number" designations in the defendant's records.[120] As the Wilson Court explained:

---

[119] See Gene and Gene, LLC v. BioPay LLC, 541 F.3d 318, 327 (5th Cir. 2008) (cited and relied on by Plaintiff) ("Whether established by [defendant] as an affirmative defense or by [plaintiff] as an element of the cause of action, the issue of consent will entirely determine how the proposed class-action trial will be conducted on the merits."); Licari Family Chiropractic Inc. v. eClinical Works, LLC, No. 8:16-cv-3461-MSS-JSS, 2019 WL 7423551, at *6-8 (M.D. Fla. Sept, 16, 2019) (adopting rationale from Gene and Gene that "[r]egardless of whether it is Plaintiffs' or Defendant's ultimate burden to prove consent on the merits, the Court's duty at this preliminary stage is to determine whether that question will involve individual inquiries as to the putative class members such that class treatment would be unworkable and inappropriate"; denying class certification where "Plaintiffs d[id] not allege any theory of generalized proof that would demonstrate that the members of any of their proposed classes did not consent to receive the Fax"); Hirsch v. USHealth Advisors, LLC, 337 F.R.D. 118, 130 n.4 (N.D. Tex. Dec. 7, 2020) ("[Plaintiff] correctly states that consent is an affirmative defense.  But that is irrelevant. Because the consent affects the class-action prerequisite of commonality, the Court must put the evidence under the examination of rigorous analysis and probe behind the pleadings before coming to rest on the certification question.") (internal quotation marks and citations omitted); Selby v. LVNV Funding, LLC, No. 13-CV-01383-BAS(BLM), 2016 WL 6677928, at *4 (S.D. Cal. June 22, 2016) ("[Whether consent is an element of a TCPA claim or an affirmative defense] is ultimately immaterial at the class certification phase.  The plaintiff's burden at [this] phase is to advance a viable theory employing generalized proof to establish liability with respect to the class involved.  Accordingly, if the plaintiff has the burden to establish lack of prior express consent, the plaintiff must prove that lack-of-consent can be addressed with class-wide proof.  Alternatively, if prior express consent is an affirmative defense, the plaintiff must similarly prove for class certification purposes that a defendant's consent defense can be defeated with class-wide proof.") (internal quotation marks and citations omitted).

[120] See 329 F.R.D. at 457-459.

> Here, the common issues of fact and law do not predominate. The apparent common issues are few and straightforward: whether Defendant called the class members' phone numbers using a prohibited method and that the phone numbers were in some way incorrect. This analysis, though, neglects what is likely the determinative—and most complex, fact-specific—aspect of each case: how that number entered Defendant's records and, related, the issue of consent. . . . Undoubtedly Defendant called some wrong numbers. Yet it is quite likely that a defaulting customer may reply with "wrong number" when the customer answers a call from the creditor collecting a past-due debt. Or someone in the customer's household might intentionally mislead the caller on behalf of the defaulting customer. . . . Nor is Defendant listing "wrong number" in its records a proxy for no consent. While at this stage it is unclear just how many cases might implicate this or other defenses, it is important to note any inquiry's starting point: Rather than engage in random robocalling, Defendant only calls numbers in its records and its intent was to call actual known customers in arrears. *Actual* customers almost certainly consented. This means that Defendant would likely have a possible defense against many class members, the precise contours of which could vary substantially. . . . This is not a case where a defendant sprayed robocalls across a nonconsenting public.[121]

In Morgan v. Orlando Health, Inc., another case in which the plaintiff was represented by one of Plaintiff's counsel here, the Middle District denied class certification for similar reasons, including because (1) the defendant presented evidence the codes the plaintiff relied on did not always indicate "wrong numbers," which necessitated a manual review of the call data for each call, and (2) the plaintiff failed to demonstrate how "wrong numbers" were proxies for "no consent."[122] Similarly, in Tillman, another case in which the plaintiff was represented by two of Plaintiff's counsel here, the Middle District denied certification of another proposed TCPA:

> There is also a wide variety of circumstances under which the free form notes "wrong number" and "do not call" may be entered into Ally's system that have nothing to do with the validity of the underlying phone number such that it would not be a TCPA violation for Ally to continue to call that individual after such free form notes were made. Nor do the notes mean that consent is lacking. The circumstances of such call notes for one class member would look different than the circumstances of another. Indeed, defendant has offered evidence that in the debt collection industry "wrong number" oftentimes does not mean non-consent because many customers tell agents they have reached the wrong number, though

---

[121] 329 F.R.D. at 459-60 (emphasis in original).

[122] *See* No. 6:17-CV-1972-ORL-41-GJK, 2019 WL 7469797, *10-11 (M.D. Fla. Oct. 23, 2019).

the correct number was called, as a way to avoid further debt collection. Thus, "wrong number" and "do not call" notations are insufficient to establish on a class-wide basis without individualized inquiry that defendant made a call to a number in violation of the TCPA.[123]

Many other cases follow suit.[124]  Specifically, with respect to revocation of consent in a class-wide setting, the Northern District in Silver explained:

> Significantly, just as potential class members could revoke their prior consent to the subject calls, they could also ***reestablish*** such consent.  Given that possibility, defendant would then be entitled to show—again, on a class member-by-class member basis—that it subsequently received such reestablished consent prior to the subject call.  In this subset of cases, individual-specific questions concerning consent would predominate because reestablishing subsequent consent could take just as many forms (i.e., words or conduct) and could occur through just as many methods (i.e., loan documentation, letter, email, oral conversation) as establishing initial consent.  In short, the court concludes that the proposed class is improper because individual issues of proof of consent would separately predominate their common counterpart.[125]

Such is the case here as it is common for call recipients to reestablish consent after asking

---

[123] Tillman, 2017 WL 7194275 at *7.

[124] See e.g., Adventist Health, 2020 WL 1674307  at *3 ("Simply put, the notation 'wrong number' and 'do not call' in Defendant's records does not equate to a showing of lack of consent."); Tomeo v. CitiGroup, Inc., No. 13-C-4046, 2018 WL 4627386, *10 (N.D. Ill. Sept. 27, 2018) (recognizing endemic problems with certifying class based on "wrong number" designations in a defendant's records in a collection setting because "'many customers tell callers they have reached the wrong number, though the customer's number was dialed, as a "procrastination tool" to avoid speaking on the phone' and 'if Defendant's customer provided a number belonging to another person, such as a spouse or other family member, an inquiry into that customer's authority to provide consent to call that number would be required.'") (quoting Davis v. AT&T Corp., No. 15-CV-2342-DMS (DHB), 2017 WL 1155350, at *6 (S.D. Cal. Mar. 28, 2017)); Hunter v. Time Warner Cable, Inc., No. 15-CV-6445 (JPO), 2019 WL 3812063, *16 (S.D.N.Y Aug. 14, 2019) ("[I]individualized inquiry will be required to determine whether putative class members may be related to the [defendant's] accountholders associated with their phone numbers and whether these relatives have validly provided consent to call the numbers.  In other words, there is no generalized means of proof to resolve whether [defendant] retains consent to call a particular class member on the basis that consent originated with a relative."); Silver, 2020 WL 607054 at *14-15 (recognizing inherent problems with certifying TCPA class based on revocation of consent liability).

[125] 2020 WL 607054 at *15 (emphasis in original).

Verizon to stop making calls.[126]  The cases Plaintiff cited to support her predominance argument involve texting or "junk fax" claims and are inapposite, distinguishable, and unpersuasive.[127]

Plaintiff's attempt to refine the question by asserting *incorrectly* that Verizon admitted the CBR Numbers are not calls to Verizon's customers—but rather, are calls to non-customer friends and family members—fails.  Verizon made no such admission.  To the contrary, the record proves that the CBR Numbers provided by Verizon's customers may be a customer's own number or that of a non-customer family member or friend.[128]  Plaintiff asserts that Verizon has not identified an example of a CBR Number belonging to a non-customer family member or friend, but neither has Plaintiff.  On this record, neither Verizon nor Plaintiff knows know who the CBR Numbers "belonged" to and Plaintiff has not proffered any reasoned way to determine that issue or show through common proof how calls to those numbers even violated the TCPA. In other words, determining to whom a CBR Number belonged requires an individualized

---

[126] *See supra.*, at pp. 9, 13, 25-26.

[127] Lanteri v. Credit Prot. Ass'n, L.P., No. 1:13-CV-1501-WTL-MJD, 2018 WL 4625657 (S.D. Ind. Sept. 26, 2018) is a TCPA texting case where the plaintiff and others sent an affirmative "STOP" message to revoke consent.  It does not concern interpreting implied revocations of consent based on "wrong number" designations in a collection-related setting.  Gene and Gene LLC v. BioPay LLC is a TCPA "junk fax" case in which the Eighth Circuit held that the District Court abused its discretion in certifying a class because the plaintiff had *not* offered common proof that consent was or was not provided.  *See* 541 F.3d at 328-29.  Bridging Comtys. Inc. v. Top Flite Fin. Inc. is anther TCPA "junk fax" case where the evidence proved that the defendant had not properly obtained consent when obtaining facsimile numbers as required by 47 C.F.R. § 64.1200(a)(4)(ii)(B)—which is not at issue here.  *See* 843 F.3d 1119, 1125 (explaining that the defendant failed to produce evidence showing it had a prior business relationship or obtained prior consent to send the facsimiles, which made the defendant's argument otherwise mere speculation).  Gene and Gene did not concern interpreting implied revocations of consent based on "wrong number" designations in a collection-related setting.  Finally, Kristensen v. Credit Payment Servs. is a TCPA texting case (which is miscited by Plaintiff) in which the United States District Court for the District of Nevada concluded that lack of consent may be a common issue—subject to common proof—"in the absence of any evidence of consent by the defendant." *See* 12 F. Supp. 3d 1292, 1307 (D. Nev. 2014).  Here, unlike Kristensen, Verizon has proffer unrebutted evidence that it had consent to call all of the CBR Numbers.

[128] *See supra.*, at pp. 3-4.

inquiry.  Plaintiff also has not proffered a reliable method to determine whether the CBR Numbers were assigned to a cellular telephone services without individualized inquiries.[129] Regardless, even if the numbers "belonged" to non-customers at the time of the call, because the CBR Numbers were provided to Verizon by its customers, there exists individualized questions as to (i) whether the customers had authority to provide the numbers, (ii) who answered Verizon's call and pressed 2, then 3, and (iii) whether whomever pressed 2, then 3 had any authority to do so.  Those questions—and others—cannot be resolved through common proof. As the Middle District explained in Sliwa:

> Given that the phone numbers at issue . . . were provided to Bright House by Bright House customers, and because Bright House provided services to households (often with multiple service users within a household), the Court finds that whether non-customers consented to receive such calls under agency law principles can only be resolved on a case-by-case basis.  Indeed, Defendants have submitted evidence demonstrating that Bright House customers often prefer to be called at a non-customer's phone (such as a spouse or family member's phone).[130]

Much like Sliwa—and in many other cases—Verizon has presented this Court with evidence that puts in genuine dispute the issue of whether (i) the press 2, press 3 Call Dispositions Codes mean that Verizon was calling a "wrong number" or (ii) any call recipient revoked consent to call. Therefore, Plaintiff may not rely on those codes as common proof to establish any fact or issue— let alone liability and damages.  Rather, the parties must engage in individualized inquiries concerning *each* call to further any issue in this case.

---

[129] *See supra.*, at pp. 19-20.

[130] 333 F.R.D. at 280 (docket citation omitted).  In her introductory paragraph in her brief, Plaintiff asserts that Verizon did not seek to obtain or document consent to make "any third party" call.  *See* Pl. Brief, pp. 1-2.  That is incorrect.  Verizon obtained and documented consent to call CBR Numbers provided by its customers through the Customer Agreements.  *See supra.*, at pp. 3-6.  Even so, Plaintiff admits that her introductory point is "irrelevant" to her "theory of the case."  *See* Pl. Brief, p. 2.  As discussed above, whether Verizon's customers had authority to provide a third-party number as a CBR Number is an individualized inquiry for trial.  *See* Sliwa,

Specifically, to assess whether any qualifying call exposes Verizon to TCPA liability, the parties and the Court would need to—in the first instance—determine whether Verizon had consent to call the CBR Number and whether Verizon was informed that the number dialed was not a number through which the customer could be reached and that Verizon should no longer call the number—but did.  Additional individualized questions include:

1.    Who owned the actual telephones that received calls dialed by Verizon using the CBR Numbers:  Verizon customers or non-customers? [131]

2.    If the telephone belong do a non-customer, did Verizon's customer have authority from the non-customer to provide Verizon with the CBR Number to call the customer?

3.    Who pressed the buttons in response to the IVR script?  Why did the call recipient press the buttons that were pressed?  Did the call recipient mean to press 2, then 2 or press 2, then 1 instead of press 2, then 3?  Was the call recipient trying to avoid a call about a past due amount for him or herself or for a friend or family member?

The answers to these questions are not just theoretically or academically important.  According to Plaintiff, there were 336,909 subsequent calls to the telephone numbers in the proposed class, which would expose Verizon to class-wide statutory damages of between **$168,454,500.00** and **$505,363,500.00**.  Such exposure makes the answers to those questions paramount to the

---

333 F.R.D. at 280; *see also* <u>Hunter</u> , 2019 WL 3812063 at *16 (explaining that "the prospect of familial consent issues in this case is not too speculative to be irrelevant to class certification").

[131] If it was a customer's CBR Number, as the customer agreed Verizon could call the number in the Customer Agreement, the customer cannot revoke consent to call.  *See* <u>Reyes v. Lincoln Auto. Fin. Servs.</u>, 861 F.3d 51, 56 (2d Cir. 2017) (holding that the TCPA did not permit unilateral revocation of consent to calls that was part of a bargained-for exchange); <u>Carl v. First National Bank of Omaha</u>, No. 2:19-CV-00504-GZS, 2021 WL 2444162, *11 (D. Me. June 15, 2021) (following <u>Reyes</u>); <u>Harris v. Navient Solutions, LLC</u>, No. 3:15-CV-564 (RNC), 2018 WL 3748155, *2 (D. Conn. Aug. 7, 2018) (same); *see also* <u>Medley v. Dish Network, LLC</u>, 958 F.3d 1063, 1069-1070 (11th Cir. 2020) (following <u>Reyes</u>); <u>Lucoff v. Navient Sol., LLC</u>, 981 F.3d 1299, 1303, n. 7 (11th Cir. 2020) (same); *contra* <u>Gager v. Dell Fin. Services, LLC</u>, 727 F.3d 265, 268 (3d Cir. 2013) (finding that <u>Reyes</u> is not the law in the Third Circuit). Also, any customer would be bound to arbitrate their dispute with Verizon and could not participate in a class action.

protection of Verizon's fundamental due process right to challenge each any every "assertion" or "indication"—implied or otherwise—that a call recipient properly revoked consent and Verizon violated the TCPA by making subsequent calls to that recipient.[132] Plaintiff cannot use Rule 23 and her implied revocation theory to deny Verizon of that right.

Put simply, certifying Plaintiff's proposed class would require this Court to engage in thousands of mini-trials based on these individualized questions, and the undeniable fact that Plaintiff's purported "common question" itself—whether a key press is an implied revocation of consent—is not subject to common proof or resolution as a matter of law and fact. Plaintiff raises no common questions that could assist this Court determine any issue in this case without extensive individualized factual inquiries. Therefore, Plaintiff's proposed class does not meet the predominance requirements of Rule 23(b)(3). It also fails to satisfy Rule 23(b)(3)'s superiority requirements for the same reasons.[133] Plaintiff's Motion must be denied as a result.

## CONCLUSION

For the foregoing reasons and for the reasons set forth in Dr. Aron's Report, this Court should deny Plaintiff's Motion for Class Certification.

---

See Boulanger 5th Decl., Ex. 1, which is attached thereto (containing relevant Customer Agreements, which contain arbitration clauses and class-action waiver clauses).

[132] See supra at pp. 14-15. See also In re Asacol Antitrust Litig., 907 F.3d at 53 (finding that plaintiffs' proposal for a claims administrator to review class members' claims and decide who suffered an injury based on forms provided by class members that defendants could not meaningfully contest would violate defendants' due process rights).

[133] Contrary to Plaintiff's claims, "recovery [in TCPA cases] is not so minimal that it would deter the class members from filing individual TCPA actions." See Sliwa, 333 F.R.D. at 282. Claimants can collect statutory damages of $500 to $1,500 per call for TCPA violations, and have ample incentive to pursue claims individually. Moreover, various law firms represent individual claimants on alleged TCPA violations, which proves that the TCPA incentivizes individual claimants and also lawyers to bring individual claims for alleged TCPA violations. See, e.g., Lemberg Law ("We Sue Collectors For TCPA Violations, Recover Up to $1,000"), https://ad.debtbulldog.com/; Fairshake, https://fairshake.com/guides/consumer-protection-laws/.

Respectfully submitted,

CELLCO PARTNERSHIP d/b/a VERIZON WIRELESS,

By its attorneys,

/s/ David G. Thomas
David G. Thomas (BBO # 640854)
Alison T. Holdway (BBO # 690569)
Greenberg Traurig, LLP
One International Place, Suite 2000
Boston, MA  02110
Tel: (617) 310-6000
Fax: (617) 310-6001
thomasda@gtlaw.com
holdwaya@gtlaw.com

Dated:  June 28, 2021

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and that paper copies will be sent all those non-registered participants on June 28, 2021.

/s/ David G. Thomas